Mr Justice Walker delivered the opinion of the court. The appellees filed their bill to foreclose a mortgage executed by the appellant to the Bank, and to subject certain lands therein described to the payment of a debt, which, as is alleged, was secured by said mortgage. A brief reference to the principal features in the mortgage may be necessary to a clear understanding of the points presented for our consideration. It appears that the appellant, Wilson, on the 14th July, 1837, subscribed for and took one hundred and twenty-seven shares of stock in the Real Estate Bank, and, in order to secure the stock and the payment of the money which he might borrow under the charter, executed to the bank a deed of mortgage for certain lands therein described, in which deed it was recited that said Wilson had, on that day, executed his bond payable to the Bank for nine thousand one hundred and twelve dollars, and a second bond for three thousand six hundred dollars, payable the 26th of October, 1861, at five per cent, interest, the interest to be paid half yearly in advance until payment should fall due; said bonds having been executed for stock subscribed as aforesaid and conditioned that if the said Wilson or his assigns should pay all such sums of money, as he might receive from the bank on accouut of stock and the interest therein, and should pay, to .whom it might be due, so much or such sum of the bonds of the State issued in favor of said bank and the interest thereon, or so much as would be equal to the stock allowed, and also the bond in said deed recited and the interest thereon, then the deed was to be void. By reference to the conditions of the mortgage it will be perceived that it purports to have been executed to the bank for the double purpose of indemnity against loss to the persons to whom the principal and interest of the State bonds might be due, having no doubt a direct reference to the State on account of her-immediate liability to the bond-holders in the event of a failure of the bank to pay, as required by the 11th sec. of the charter; and for the further distinct and independent purpose of securing the bank against loss for any money which she might loan the stock-holders on account of stock, for which provision was made in the 17th sec. of the charter. It is contended, however, that under the provisions of the charter, this mortgage was given for the sole purpose of indemnity to the State, in case she should be required to pay the bonds or interest, and to the bond-holders when the bonds or the interest fell due; and that if any different apparent interest or purpose is expressed in language in the 13th sec. such purpose is inconsistent with the provisions of the 14th section, which transfers the bonds and mortgages to the State and the bond-holders; and that as this provision in the 14th sec. is paramount in importance, that in 13 sec. must yield to it. Upon the correctness of this position rests the decision of the main question at issue, which can only be determined by a proper understanding and correct interpretation of the act incorporating the Bank. The first section of the act provides “ That there shall be established in this State, a bank under the name and title of The Real Estate Bank of the State of Arkansas, with an original capital of two millions of dollars, to be raised by loans or negotiations on the security of real property, at its cash value, with the guarantee of the public credit as hereinafter provided.” The 10th section provides “That the State shall issue two thousand bonds of one thousand dollars each, payable in twenty-five years, bearing interest at 5 per cent, per annum.” The 11th section provides “ That the Bank shall pay the bonds and the interest as it shall become due.” The I3th section provides “ That all the subscriptions to the capital stock of said Bank shall be guaranteed and secured by mortgages and bonds, executed to said Real Estate Bank of the State of Arkansas, to be, in all eases, at least equal to the amount of stock subscribed, which said mortgages shall be conditioned for the payment of all moneys received from said bank on account of subscriptions for stock, and for the final payment of the bonds of the State and the interest thereon subject to such rules, regulations and restrictions as may be herein after provided, which said mortgages shall'form the basis of, and stand as a full security for, the loan or loans and the interest thereon, which the said directors are authorized to make, and designated in the first section of this act as forming the capital of said Bank.” The 14th section provides “ That, for the guaranteeing of the bonds to be emitted by the State, in favor of the Real Estate Bank and of the interest, and for which the State pledges its faith and credit, all the bonds with the privileged mortgages executed for stock, are hereby transferred to the State and the holders of the bonds which may be issued by the State in virtue of this act: and the governor shall only emit the State bonds after it shall have been proven to him, by the certificate of the President of said bank, that mortgages have been executed by the stockholders of said bank in conformity with, and according to, the true intent and meaning of this act, for at least one-eighth more than the bonds required.” The 17th sec. provides “ That each and every stockholder shall be entitled to a credit equal to one-half of the total amount of his shares.” These are the principal provisions of the charter which bear upon the question before us. Before, however, we are permitted to resort to forced construction, such as will defeat and destroy the effect of any portion of the act expressed by the ordinary import of the language used, we should first see whether the several provisions of the act may not be so harmonized as to give effect to all of its parts, and, at the same time, carry into effect the general purpose and intent of the act; for it is a rule that every clause and word of a statute shall be presumed to have been intended to have the same force and effect. Opinion of the Justices, 22 Pick. 571. Smith’s Com. 629. A statute is to be construed so that it may have a reasonable effect, agreeably to the intention of the legislature. (Kelly Bank Petitioners, 23 Pick. 93.) It ought to be construed, if possible, so that no clause, sentence or word shall be void, superfluous, or insignificant. (James vs. Dubois, 1 How. R. 285. Hutchen vs. Niblo, 4 Blackf. 147. 1 Blac. Com. 89.) But if, from a view of the whole act, the intent is different from the literal import of its terms, then the intent should prevail. (Brown vs. Wright, 1 Green. 240.) It is only, however, where the terms used are ambiguous, that construction is permissible; for, whether expressed in general or limited terms, there is no room for construction, where the language is unambiguous, plain and consistent. Bartlett vs. Morris, 9 Port. 266. Wilkinson vs. Leland, 2 Peters 662. People vs. The Utica Ins. Co., 15 J. R. 358. Smith’s Com. 627. With these rules before us, we will proceed to examine the several sections of the charter above referred to, and such others as we find connected with the point under consideration. After a careful examination of the charter we have been unable to discover the ambiguity and vagueness which has been ascribed to it, at least to that portion of it which is the immediate subject of consideration. The obvious intention of the legislature was to establish a bank which would furnish an increased circulating medium and facilitate the means of obtaining exchange, and thereby give a quickening impulse to commerce and trade, and furnish capital by which to aid the great agricultural interest of the State. However visionary this may, in reality, have been in view of the commercial and agricultural resources of the country at the time, it is, nevertheless, true that such were the leading motives which induced the legislature to grant the charter; indeed, the sole inducement, in connexion with the privilege of borrowing $50,000 of the bank annually for ten years, and a bonus of $5,000 per annum for ten years, as provided for by the 34th and 36th sects of the charter. To accomplish this object, and to bring into existence the agent by which these ends were to be attained, it became necessary to hold out such corresponding advantages to the citizens of the State as might induce them to subscribe for stock and pledge their lands for the payment of the capital to be used in banking. These inducements were, that, if the corporation would guarantee the payment of the bonds to be issued by the State and the interest thereon, by mortgage upon the lands subscribed, the State would issue bonds, by the sale of which it might raise its bank capital; and the State, through her legislature, by the terms of the charter, held out to the citizens, as a further inducement to become subscribers for stock, the advantage of getting large sums of money upon more indulgent and favorable terms than were allowed to citizens generally, and the ultimate prospect of receiving a dividend from the banking operation. Influenced by these evident motives and inducements, the corporation was called into existence as the agent by which they were to be mutually benefited. When the State issued her bonds, as she was required to do by the 10th section, it was unquestionably upon the faith of the security given by mortgages under the 13th section. In that section, it was required that the stockholders should execute bonds and mortgages to the bank, conditioned for the payment of the bonds of the State and interest thereon, and also for the payment of all moneys received from the bank on account of subscriptions for stock. The first of these conditions enured to the benefit of the State and the bond-holders; the second, to the bank and the stockholders: To the bank, by furnishing security for the money allowed to be drawn under the 17th section; and to the stockholders, by facilitating their means of drawing money upon security already given; thereby giving to the State and to the bank distinct and independent security touching liabilities in no respect dependent on each other. These mortgages having been executed by the stockholders to the bank, in order to assert and secure the interest intended by the general provisions of the charter, they were, by the 14th section, transferred to the State and bondholders. Transferred for what purpose ? Most clearly to preserve the equitable lien which was created to secure the State and the bond-holders, because this was the whole intention and purpose of the mortgages so far as these were concerned. Nor do we think it just to construe the terms “transfer to the State,” áse., to mean any other or greater interest than that which related to the State and the bond-holders. In doing so we must suppose that the legislature intended to defeat and destroy the security which the 13th section afforded the bank for stock loans, and the facilities offered to stockholders in receiving stock loans, and without which they might have declined to subscribe for stock: or could it be supposed that, the legislature would have inserted a distinct and important privilege to the bank and to the stock-holders in the 13th section, and have inserted an after section having direct reference to it, and without which the corporation would have been exposed to a draw from each stockholder of half the amount of stock subscribed on a credit of twenty years, if they had not intended and understood that the institution should be protected and secured from loss by the mortgages as required by the 13th section? Without referring to other inconsistencies which would arise if we indulge the construction contended for by the appellant, we think a more rational and consistent construction may be given, and one which, according to the rules to which we have referred, must govern this case; which is that when the word “transfer” is used, it must be considered as in reference to the interest and indemnity secured by the mortgage to the State and the bond-holders. By this construction, (which in view of the object designed to be effected, is as far as ought to be indulged, or could be beneficial to the State or bond-holders), their rights and interests are fully protected; and at the same time every sentence and word of the act have their full and appropriate force and effect; and it is evident that any other construction would not only prove highly prejudicial to the bank and the stock-holders, but would be most decidedly so to the State. It will be seen by reference to the 11th sec, that the bank was bound to pay the capital and the interest as it became due on the bonds issued by the State, and if this security is withheld from the bank, whereby the stock debts are lost and the ability of. the bank to pay the bonds and interest lessened, the liability of the State to pay them is proportionably increased. In another point of view it must be considered prejudicial. The great object which the State had in view in establishing the bank was to aid the great agricultural interest of the State. This was to have been effected by a sound currency and facilities in exchange, and how would it be possible to do this if the bank should be denied the privilege of collecting her debts by enforcing the securities furnished by the charter? It is true, as has been argued, that the bank has failed, and that her credit cannot be restored, however prompt and efficient her agents may be and with the most extended facilities; and it may be also true that she will not apply the money collected to the payment of either principal or interest of the State bonds. If this was a case in which the financial conduct of the bank was involved, these questions might properly arise. In this case however we are called upon to construe the charter granted by the legislature, and in doing so, we must consider it as it was intended to be without reference to its present condition. If its present condition could have been foreseen, it is evident the charter would not have been granted. The counsel for the appellees have referred us to the case of Union Bank of Florida vs. Parkhill's adm., 2 Hoge Rep. 660. As far as the charter of that bank can be learned from references in the report of the case, its prominent provisions are strikingly similar to those of the charter of the Real Estate Bank. The mortgages, however, were taken to the Florida bank directly to secure the payment of the bonds issued by the Territory of Florida, by the sale of which the capital of the bank was raised, without any provision whatever whereby the loans to stockholders upon their stock notes were to be secured. The only provision of the charter, upon which the security was claimed, was a provision in the 9th sec. which provides “That any stockholder may at any time release his property mortgaged by paying the amount subscribed, and also by paying such loans as may have been made on the faith of it.” The court, in delivering its opinion said “It is contended in view of the 8th sec. of the charter that the object for which the bonds and mortgages were given by the subscribers for stock, was to secure payment of the principal and interest of the bonds issued by the Territory to the extent of their stock subscription. It is admitted that they were given for that purpose, yet it seems to this court that was not the only purpose of the mortgage;” and after a clear and forcible argument upon the construction to be given to the 9th sec, in connection with the other provisions of the charter, that court says, “We have shown we think that the mortgage given by the stock-holder, was executed for the double purpose, 1st, as provided by the 8th sec. to secure payment by the bank of the principal and interest of the bonds issued by'the Territory, and for this purpose the Territory, the third party in the charter of the bank, is interested in the mortgages; 2d, to secure payment from the stock-holder to the bank of his stock note or obligation and interest, provided he fails to renew the note or obligation and pay interest as provided in the 29th sec.; and for this purpose the bank and its creditors are interested in the mortgages as well as for the first purpose;” and in conclusion, “that any other construction would tend to make the stock-holders an irresponsible class, with exclusive privileges, (and the greater the bond-holder the greater the privilege) as well also as inflict on the bond-holders and other creditors of the bank, the greatest injuries and the most stupendous fraud. This authority is not only in point, but decided under a charter where there was no express provision for securing the payment of the stock loans, such as is found in the charter of the Real Estate Bank. The condition in the 13th sec. making the stock mortgages responsible for stock loans as well as for the payment of State bonds and the interest, was indispensably necessary in order to protect the institution from certain and speedy bankruptcy. The 17th sec., as we have before remarked, had conferred power on the stock-holders at once to draw half the amount of their subscriptions for stock, and but for the security afforded by the provisions of the 13th sec. this large sum would have been unsecured, or if secured, at least one of the best and most prominent securities withdrawn. We cannot for a moment indulge the belief that such was the intention of the Legislature. After the most attentive consideration of the several provisions of the charter, we are satisfied they are reconcilable with each other, and are entitled to the full force and effect which their language imports, limiting the transfer in the 14th sec. to mean a transfer of the rights and interest of the State and bondholders provided for by the terms of the mortgage; that the two conditions in the mortgages are separate and distinct, and secure rights to the State and the holders of State bonds, prior in point of time and equity, and a subsequent equity and security to the bank for loans made to the stock-holders on account of stock, to the same extent and as fully as if two distinct instruments, the one prior to the other in point of time, had been executed for that purpose. Had such been the case, it would scarcely have been contended that the owner of the property had not power at pleasure to mortgage it as often and to whom he pleased, without consulting prior mortgagees, whose interests could in no respect be affected by such subsequent acts. There is no perceivable difference between the two cases, unless it is that the covenants to each are in the same instrument. This circumstance can in no wise affect the validity of the contract. The parties were alike capable of contracting; the consideration and the subject matter alike lawful, whether expressed in one or two instruments. Suppose, however, that the charter had been entirely silent on the subject, and had made full and positive provisions in regard to the conditions of the mortgages to secure the State and the holders of State bonds; and suppose the stockholders to have complied strictly wdth its provisions, and that, after having done so, by agreement, the stockholders had agreed with the bank to give to the bank a mortgage to secure the bank on account of stock loans, there is certainly no reason in law why they might not do so : nor can we see the slightest objection to inserting a clause to that effect in the same instrument which furnished security to the State. Unless the validity of the deed to the State and the bond-holders should be affected by it, they would have no right to complain, and it is difficult to see how their rights could be affected by inserting a.clause disconnected with and not contradictory to the terms of the mortgage to them. We are strongly inclined to the opinion that the bank and the stockholders' might well have done so. Because the State required good and sufficient security as an indemnity to her. for the loan of her bonds, she acquired no control over the rights of the parties to contract in any lawful manner that other citizens may. The mere fact that it was on the same paper on which the State’s mortgage was written amounted to nothing. The deed was made directly to the bank, and, by an express provision of the charter, remained in its custody : so that, upon the right of custody, no question could arise. It is wholly unnecessary, however, to rest our opinion upon this ground, as we are decidedly of opinion that that clause in the 13th section, which provides a condition in the mortgage in favor of the bank to secure stock loans, is not impaired by any other provisions in the charter. The decision in the case of Duncan vs. Biscoe et al., 2 Eng. R. 175, is based upon a construction of the Statute which defeats and nullifies this provision, and is thez’efore irreconcilable with this decision. The next point for our consideration, is, whether the State and bond-holders should not have been made parties to the bill. The general rule in regard to parties in courts of equity is, that all persons materially interested, either legally or beneficially, in the subject matter of the suit, are to be made parties to it, either as complainants or defendants, however numerous they may be: so that there may be a complete decree which shall bind them all. To this rule, there are exceptions arising from necessity or convenience, by which, when the court can dispose of the merits of the case before them without prejudice to the rights or interests of other persons, who are not parties, they will proceed to-do so. Story’s Eq. Pl. 78. In this case, the State and the bond-holders have no interest^ which can be, in any manner, affected by the decree. Although there is some conflict of authority as to whether they, as prior mortgagees, should be made parties to a bill by a subsequent mortgagee to foreclose, yet the authorities are uniform and pointed that, where they are not made parties, their interests are not to be affected by the decree. Story's Eq. Pl. 177. Danl. Ch. Pl. & Pr., 1 vol. 262. Id. 327. Fenley vs. Bank United States, 11 Wheat. 304. And the doctrine seems to be sustained, both by the authorities and upon principle, that, so far as the prior incumbrancers are concerned, thejr need not be made parties to a suit by a subsequent mortgagee, and for this sensible reason that their interests are not affected by the decree. In 1 Danl.Ch. Pl. & Pr. 327, it is held unnecessary to bring in prior mortgagees or make them parties, because they will have the same lien upon the estate after as before the decree. And in the case of Holcomb vs. Holcomb, 2 Barbour 23, it was said by the court, “ The plaintiff may also make prior incumbrancers parties to the bill for the purpose of having the amount of such incumbrance liquidated and paid out of the proceeds of the sale, or he may, at his option, have the premises sold to such prior incumbrancer.” The rule does not apply with the same force to the mortgager; and it is desirable when the rights and interest of the several claimants to equitable liens will permit, that all the parties should be brought before the court, and more particularly where a sale of property is to be made, so that the purchaser may be encouraged to bid with an assurance that he is buying a perfect title. It was mainly upon this ground that the decision turned in the case of McGown vs. Yerks, 6 J. C. R. 450. 3 J. C. R. 459. 11 Wheat. 304. Independent of the general principle'which strongly favors the conclusion that it is not indispensably necessary that all the parties having an interest in the subject matter, should be brought before the court, though it is permissible and perhaps safest to do so, we are satisfied that the present case comes fully within the exceptions to the general rule. In the first place, this court has no means of ascertaining whether the State or bond-holders had any present equity which they' could enforce, except the mere fact upon the record that the same lands were mortgaged to save and indemnify them against loss upon the happening of a contingency. Pías that contingency happened ? How are we to know it? It is a matter of .private dealings between the parties. The bonds are certainly not due: the charter shows that. But has the interest been paid? if so, by whom? The bank may have paid the interest regularly, or have bought up the bonds. Of all this, however, we can know nothing. But suppose them due and outstanding, until the State has paid them, or the interest on them: in what does her equity consist ? Suppose the parties all before the court, what decree could be rendered, so as to protect their present and future interest, particularly when connected with the present interest of the bank with her subsequent lien and entire debt due ? Should the whole estate pass by the sale, or should reservations be made for contingent accruing liabilities? If the whole estate is decreed to be sold, should the residue of the money arising from the sale, after paying the present liabilities oí the prior incumbrancer, remain to await the happening of future contingent liabilities, or shall not the subsequent lien take it ? If not, his suit is a mere farce: and if he does take it, is it not evident that the State and the bondholders have parted with their security ? If, however, all these difficulties could be obviated, it would be extremely difficult to ascertain who the bond-holders are, so as to get them before the court. These bonds were sold to capitalists in Europe and America, and we may well suppose are passing daily in the market by mere delivery. The authorities are decided that, under such circumstances, it is not only not necessary, but, in some instances, improper to unite such parties in the same suit. Story Eq. Pl. 81. Jeremy Eq. Pl. 31. 1 Danl. Ch. Pl. & Pr. 321. We think, therefore, that the State and the bond-holders should not have been made parties to this suit; and that it is safest and best to leave the bank to the benefit of whatever interest she may have by virtue of her subsequent lien. It is a matter at best between her and the mortgager; and although his equity of redemption must sell under embarrassed circumstances, it is the legitimate result of his own contract, and he must abide the consequences. The purchaser will at least have a fair prospect for quiet enjoyment of his purchase for some years (as the bonds are not due) with the ultimate prospect of being dispossessed by the prior rights of the State or the bond-holders, should it become necessary lor them to foreclose. In the mean time, from the view we have taken of the respective rights of the parties, the State and the bond-holders are left to assert their prior lien at any time they may accrue or the parties deem it necessary to do so. The only remaining question relates to the right of the assignees of the Bank to assert this claim. About this, there can be no question. The law is that all incidental securities follow the debt and pass with it by the assignment to the assignee. The case of Patterson vs. Hull, 9 Cow. 75, and the authorities there cited, are to the point, and we think conclusive. The decree, in other respects, appears well warranted by the facts of the case, and is in all things affirmed.